UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| Juliann Andrews | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO. |
| | * | |
| MaineHealth, | * | |
| | * | |
| Defendant | * | |
| | * | |

**PLAINTIFF'S COMPLAINT
AND DEMAND FOR JURY TRIAL
INJUNCTIVE RELIEF SOUGHT**

Plaintiff Juliann Andrews, by and through counsel, complains against defendant, MaineHealth, as follows:

1.      Ms. Andrews brings this action because defendant discriminated against her in employment on the basis of disability, subjected her to a hostile work environment, and retaliated against her because she requested accommodation of disability and exercised her right medical leave, and because she reported and opposed discriminatory treatment, in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12101 *et seq.*, the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.,* the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and the Maine Family Medical Leave Requirement Act, ("MFMLR") 26 M.R.S. §§ 843 *et seq.*

**JURISDICTION AND PARTIES**

2.      Plaintiff Andrews is a resident of Brunswick, Cumberland County, Maine.

3.      Defendant MaineHealth  is a corporation incorporated in Maine, with a principal place

1

of business in Portland, Cumberland County, Maine.

4.  Mid Coast-Parkview Health was a Maine Corporation with a place of business in Brunswick Maine which merged with MaineHealth in about January 2021.

5.  Mid Coast Hospital was a Maine Corporation with a place of business in Brunswick Maine which merged with MaineHealth in about January 2021.

6.  Defendant MaineHealth is the successor to Mid Coast-Parkview Health and Mid Coast Hospital.

7.  As of about January 2021, defendant MaineHealth assumed and thereafter continued the operations and workforce of Mid Coast-Parkview Health and Mid Coast Hospital.

8.  As of about July 2020, defendant MaineHealth had actual or constructive notice of plaintiff Andrews' claims of discrimination against Mid Coast-Parkview Health and Mid Coast Hospital.

9.  Defendant MaineHealth has assumed the legal identity of Mid Coast-Parkview Health, assumed its liabilities and assumed its ability to provide relief directly to plaintiff Andrews.

10. Defendant MaineHealth has assumed the legal identity of Mid Coast Hospital, assumed its liabilities and assumed its ability to provide relief directly to plaintiff Andrews.

11. This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that that they form part of the same case or controversy.

13. On July 6, 2020, Ms. Andrews filed a charge of discrimination against defendant's

predecessor corporations, Mid Coast Parkview Health and Mid Coast Hospital, with respect to the allegations herein with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

14.    Ms. Andrews filed amended charges of discrimination with the MHRC and EEOC against defendant's predecessor corporations, Mid Coast Parkview Health and Mid Coast Hospital in 2021 and against defendant in 2022.

15.    On April 13, 2022, on Ms. Andrews' request, the MHRC issued notice of right to sue on her claims under Maine law.

16.    On May 25, 2022, on Ms. Andrews' request, the EEOC issued notice of right to sue on her claims under the ADA.

17.    Ms. Andrews has exhausted all administrative remedies.

18.    All of the discriminatory practices alleged herein were committed within the State of Maine, and within Cumberland County.

19.    Defendant is subject to the jurisdiction of this Court.

20.    This action is brought properly in the District of Maine pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to Ms. Andrews' claims occurred in this judicial district.

21.    At all material times, defendant individually or by its predecessors employed Ms. Andrews within the meaning of the ADA,  FMLA, MFLRA, MHRA and MWPA.

22.    Pursuant to Federal Rule of Civil Procedure 38(b), Ms. Andrews hereby demands a trial by jury on issues triable of right by jury.

## STATEMENT OF FACTS

23.     Ms. Andrews was employed as a Patient Services Representative with Mid Coast-
        Parkview Health, also doing business as Mid Coast Hospital, since merged with
        defendant  MaineHealth, (hereinafter referred to as "defendant" or "Mid Coast") in its
        Central Registration Department from May 5, 2017 to November 18, 2020.

24.     Ms. Andrews has a disability of a seizure disorder, along with mental health conditions
        including anxiety and depression for which she received medical treatment, including
        during 2019 and 2020.

25.     Ms. Andrews was hired to work part-time, starting at 20 hours per week, which
        increased to 25 then 32 hours per week on afternoon to evening shifts and Saturdays.

26.     At the outset of her employment by Mid Coast, Ms. Andrews disclosed to her
        supervisor, Bonnie Novak that due to her disability, she could not work 40 hours a
        week, but could work part-time hours.

27.     Ms. Andrews performed her job duties well, and received positive evaluations from her
        supervisors in 2017, 2018 and May 2019.

28.     In about February 2018, at the suggestion of her supervisor, Bonnie Novak, Ms.
        Andrews requested intermittent leave under the FMLA for her health conditions to
        cover work absences which Mid Coast approved.

29.     In about April 2019, Ms. Andrews again requested and Mid Coast approved
        intermittent leave under the FLMA to cover any work absences that were due to her
        seizure disorder and health conditions.

30.     Prior to July 2019, Ms. Andrews had one or more seizures that caused her to be absent
        from work.

4

31.    In about March 2019, Alyssa Brown became Supervisor for Registration for Mid Coast and Ms. Andrews' supervisor.

32.    As of March 2019, Brown was aware of Ms. Andrews' seizure condition from their prior communications.

33.    As of July 15, 2019, Brown was aware that Ms. Andrews had been approved for intermittent leave under the FMLA, and that Ms. Andrews had used intermittent leave.

34.    On April 27, 2019, Ms. Andrews learned from the Mid Coast newsletter that she was commended by a patient for outstanding work helping a fearful child, of which Brown was aware.

35.    In about July 2019, Ms. Andrews told Brown that she needed to use one day of medical leave.

36.    Brown asked, with evident irritation and a derogatory tone, if it was because of Ms. Andrews' "issues," which was the term Brown used to refer to Ms. Andrews' seizure disorder.  Ms. Andrews answered that it was.

37.    On July 24, 2019, Brown presented Ms. Andrews with a written counselling for claimed performance issues that she had not raised previously, and that she did not give Ms. Andrews a chance to rebut.

38.    Brown wrote that Ms. Andrews was refusing to register patients, arguing with a coworker in front of customers, not answering phone calls from the emergency department, and making errors.

39.    The claims Brown made about Ms. Andrews' performance were false.

40.     Without justification, Ms. Brown criticized Ms. Andrews for another employee's refusal to do her job of registering a patient.

41.     Ms. Brown unfairly cited Ms. Andrews for the co-worker's improper conduct while a patient was in her presence, of calling Ms. Andres, saying that she was sending the patient to Ms. Andrews for registration, saying not to send the patient back, then hanging up the phone.

42.     Contrary to Ms. Brown's claims, there was no indication that Ms. Andrews had missed or not answered phone calls.

43.     Brown asserted, without basis, that Ms. Andrews made accuracy errors which had been made by other employees, which Ms. Andrews had no way to verify, and which were not her fault.

44.     Ms. Andrews was extremely upset by Brown's unwarranted criticisms.

45.     Brown asserted that Ms. Andrews overreacted to the discipline, to which Ms. Andrews objected that she had no prior notice of the performance deficiencies Brown asserted, and asked Brown to provide details so Ms. Andrews could better respond.

46.     Due to the stress from Brown's unwarranted criticism, Ms. Andrews suffered a major seizure while at work on July 29, 2019, lost consciousness and was treated in the Emergency Department.

47.     Ms. Andrews was out of work on FMLA medical leave the four following days.

48.     On July 22, 2019, the Hospital wrote a letter informing Ms. Andrews that she was to receive a $1.05 per hour pay raise, which letter she did not receive until August 1.

49.     When Ms. Andrews returned to work, on about August 5, Brown gave her the letter notifying of the raise, told her of the $1.05 an hour pay raise, stated the raise was confidential and asked Ms. Andrews not to tell others.

50.      When Ms. Andrews returned to work in August 2019, she was told that a new employee, who was moving from per-diem to full-time status was going to start training with her on Saturdays.

51.     In early September 2019, Brown told Ms. Andrews that they were going to change shifts so the new employee could work on Saturdays, and that Andrews would not have to work on Saturdays.

52.     Ms. Andrews objected that she liked her Saturday shifts, to which Brown responded that she was "trying to be kind" and "this is a kind gesture."

53.     Ms. Andrews was unhappy that Brown was cutting 6 hours from her weekly schedule, and asked that Brown to let her know if she could fill in.

54.     In October 2019, Brown gave the new employee Ms. Andrews' Saturday shifts.

55.     Because of Brown's conduct, comments, unwarranted criticisms of Andrews' job performance, and decision to cut Andrews' work hours, Ms. Andrews believed that Brown was treating her unfairly and harassing her because of her disability and her use of medical leave.

56.     In about November 2019, Ms. Andrews informed Ms. Brown that she needed to take FML leave for a day, because she was feeling dizzy, which is a sign of a potential seizure.

57.     Ms. Brown asked whether the requested leave was part of Ms. Andrews' "issue," to which Ms. Andrews indicated it was, and Brown expressed displeasure with the request.

58.     In about early February 2020, Ms. Andrews' primary care provider submitted a Family Medical Leave certification to Mid Coast Hospital.  Among other matters, the provider's certification indicated that due to flareups of her health conditions, Ms. Andrews would need to be absent from work on an intermittent basis, estimated to be approximately 4 days per month.

59.      In late February 2020, Brown informed Ms. Andrews that her hours were being cut by 5 hours per week and her schedule was changed to work from 3 p.m. to 7 p.m. instead of 2 p.m. to 7 p.m.

60.     Brown stated it was Andrews' original schedule, that her 2 p.m. start time was never officially on the books, and that she wanted everything to be correct for the upcoming merger with MaineHealth.

61.     Brown then asked Ms. Andrews if she wanted to work on Saturdays because the new employee wanted them off.

62.     Ms. Andrews responded that she would work some but not all Saturdays because working 6 days a week is demanding.

63.     In March, 2020 with the onset of COVID restrictions, Mid Coast sent a letter out saying that it guaranteed to pay employees for their regular or "core" hours, even if they were not working all those hours.

64.     In early March, Brown denied part of Ms. Andrews' request for 28 hours vacation time to attend her uncle's funeral at the end of March, stating that under Mid Coast policy employees are supposed to give 30 days' advance notice.

65.     Ms. Andrews was aware Brown allowed one or more other employees to take vacation even though they had not given 30 days prior notice.

66.     Ms. Andrews believes that Brown denied her vacation request in discrimination against her because of disability and because of her use of medical leave.

67.      In early March 2020,  Brown told Ms. Andrews that she was changing people's schedule around to fit the needs of the company, and that because the lab was closing at 6 p.m. she wanted Ms. Andrews to work from 2 p.m. to 6 p.m.

68.     Shortly thereafter, Ms. Andrews learned that Brown was allowing other employees to work 6 hours while they were paid for their regular 8-hour schedule.

69.     Ms. Andrews believed Brown was discriminating against her because of disability because she did not offer to allow her to work fewer hours while being paid for her regular schedule of 4 hours, and because Brown was changing Andrews' work schedule to make it possible for other employees to leave early and to be paid for the time Ms. Andrews was doing their work.

70.     On March 24, 2020, by text message, Ms. Andrews objected to Brown that she was discriminating against her in changing her schedule to start work at 2 p.m. to accommodate other employees.

71.     Ms. Andrews objected to  discriminatory treatment to Brown, pointing out that Brown approved paying other employees for hours they did not have to work, while deciding that Andrews only was paid for the hours she actually worked.

72.     Ms. Andrews objected to Brown that her medical doctor did not want Andrews' work schedule changed for medical reasons and that Andrews had called the Mid Coast's Employee Health Department, which handles accommodation and leave matters.

73.     In the same time period in about late March 2020, Ms. Andrews contacted the Hospital's Human Resources Department ("HR") and reported that she believed she was being discriminated against in pay and scheduling.

74.     The HR staff told Ms. Andrews that would be discrimination, and that Brown would not do that.

75.     The HR staff told Ms. Andrews that she was mistaken, that the HR staff had checked with Brown and been told that the work schedules of other employees had not changed.

76.     Ms. Andrews next met with another HR representative and reiterated her complaint that she was being treated differently and unfairly in comparison with other employees.

77.     Shortly thereafter Mid Coast's HR manager, Patty Feldman, called Ms. Andrews and discussed her complaints of discriminatory treatment in pay and scheduling.

78.     Thereafter, Feldman arranged changes to Ms. Andrews' schedule and pay with the arrangement that Ms. Andrews worked from 3 to 6 p.m., and that she was paid for 20 hours while working 15 hours, which arrangement was in effect from March 9, 2020 until June 5, 2020.

79.     On May 13, 2020, Brown gave Ms. Andrews a negative evaluation, with the lowest possible ranking "Opportunities for Improvement."

80.     Brown ignored the positive feedback Ms. Andrews had received for interactions with patients and did not factor in Ms. Andrews' high accuracy rate of 98.7 percent.

81.     Instead, Ms. Brown cited Ms. Andrews with a litany of unfounded criticism in further discrimination based on disability, and use of medical leave, and in retaliation for Ms. Andrews' complaints of discriminatory treatment.

82.     Brown's evaluation faulted Ms. Andrews for being unwilling to be flexible about her work schedule "to accommodate the needs of the department," which referred to Ms. Andrews' complaint that Brown was singling Andrews out for cuts in hours and pay, changing her schedule solely to benefit other employees, and not offering Andrews the same pay arrangements as other employees.

83.     Ms. Andrews believes Brown made the negative evaluation in retaliation for her request that her work schedule not be changed for medical reasons, and in retaliation for her complaints to Brown and HR about discrimination in scheduling and pay.

84.     Brown's evaluation of Ms. Andrews made several assertions that had not been raised before and were false, including that Andrews was failing to communicate about what work she was doing, and not following instructions.

85.     In truth, Ms. Andrews had been sent to work in a new location without instructions, and did what was assigned.

86.     Brown's evaluation claimed other employees stated Ms. Andrews was not wearing protective masks, which was false, she was wearing homemade masks, and no one told her that she was not wearing the correct type of mask.

87.     Brown's evaluation stated Ms. Andrews was reading books while at work, which was not true, she only took one 10-minute break one day to read after spending a long stretch of time working.

88.     Brown wrote that Ms. Andrews' communication and cooperation with coworkers was sometimes lacking, without justification.

89.     Brown faulted Ms. Andrews for struggling to accept constructive criticism, referring to Brown's unjustified counselling of July 2019.

90.     Brown held the meeting for Ms. Andrews' evaluation with the Hospital's interim Director of Registration and Billing, Joe Hall.

91.     Hall did not acknowledge that HR had intervened and overruled Brown's decision by changing Ms. Andrews' work schedule and pay arrangement.  Instead among other matters, Hill stated that he did not understand what the big deal was about changing Ms. Andrews' work schedule.

92.     As the immediate result of the unfair, negative evaluation, Ms. Andrews ended up with a very low, 14 cent per hour, pay raise for the following year.

93.     Ms. Andrews believed the poor evaluation set her up for further unwarranted adverse actions, and further differential and hostile treatment in her employment by Mid Coast.

94.     On July 6, 2020, Ms. Andrews filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") against Mid Coast for disability discrimination, hostile work environment and retaliation.

95.     The MHRC issued notice to Mid Coast of Ms. Andrews' charge on July 28, 2020, which notice Mid Coast received in July 2020.

96.     In the summer of 2020, Ms. Andrews started training in the diagnostic imaging department, and continued to work in the registration department.

97.     Thereafter issues with Ms. Andrews' interactions with co-workers arose, including that Registration supervisor, Melinda Palmer told a newly hired employee that he could

remove and discard Ms. Andrews' belongings from a shared desk, which upset Ms. Andrews.

98. Later, an issue arose with a co-worker, Rhea, who made false accusations about Ms. Andrews.

99. Supervisors Palmer and Brown called Ms. Andrews to a meeting, where she explained and demonstrated in the daily activity report why she was correct, and the coworker was not, however the supervisors did not acknowledge that Ms. Andrews was correct.

100. Next, on a Friday, Ms. Andrews was cleaning the office for the weekend, and put some wilted flowers on the trash to be discarded, because she understood the coworker did not want them.

101. The following Monday, Brown gave Ms. Andrews a verbal warning, even though Andrews explained why she thought the co-worker no longer wanted the flowers.

102. Several weeks later, Ms. Andrews accidentally bumped into a flower pot on the co-worker's desk, and it fell and broke.  Ms. Andrews left a note for the cleaners, asking them to clean it up, and left a note for Ms. Brown saying she would apologize to the co-worker on Monday.

103. On October 15, 2020,  HR manager Feldman and Brown, who brought a newly hired manager whom Ms. Andrews did not know,  called Ms. Andrews to a meeting, asserting they were doing an investigation of issues including the broken flower pot.

104. Ms. Andrews explained breaking the pot was an accident, however, the defendant's managers continued questioning Ms. Andrews, and made false accusations about the accident.

105.   Ms. Andrews informed the three managers that she was getting upset, and was afraid the anxiety she was experiencing might cause a seizure.

106.   Ms. Andrews had an FMLA approval for unscheduled intermittent leave, which also was a request for accommodation, on file with Mid Coast's HR department for her seizures and related health conditions.

107.   Feldman stated that if Ms. Andrews had a seizure disorder, she should have applied for FMLA, to which Ms. Andrews responded that she had already done so.

108.   Feldman stated that she did not  know about Ms. Andrews' FMLA approval being on file, however, Brown nodded indicating that she knew of the FMLA approval.

109.   Ms. Andrews asked to take her mask down so she could breathe better, but Feldman said no.

110.   Ms. Andrews asked to leave the meeting, but Feldman said no, they wanted to finish the meeting, and continued questioning Ms. Andrews.

111.   Under the anxiety provoked by defendant's managers unrelenting questioning and false accusations about an accident, Ms. Andrews began to hyperventilate, asked to leave, and then left the meeting.

112.   After a short time, Ms. Andrews returned to the meeting, then became more upset, and left the building in tears.  That night, due to the anxiety from defendant's managers' hostile treatment, Ms. Andrews suffered a seizure.

113.   Ms. Andrews was absent from work on October 15, 2020 and October 16, 2020, which absence was covered by defendant's approved FMLA medical leave, and which leave was an accommodation of her disability.

14

114.    Ms. Andrews informed Mid Coast supervisor Melinda Palmer on Friday, October 16, 2020 that she was out of work on medical leave due to her health conditions.

115.    Palmer told Ms. Andrews that she would need to provide a doctor's note if she did not return to work on the following Monday.

116.     On October 19, 2020, Ms. Andrews returned to work, where Feldman told her they were not allowing her to work, and instead putting her on paid administrative leave while they investigated further.

117.    On October 28, 2020, Feldman and Coleen Farrell, HR Director for Mid Coast, called Ms. Andrews to a meeting, where they gave her a disciplinary Final Warning, which made multiple false claims.

118.    As a proposed alternative to the disciplinary actions, Feldman and Farell provided a severance agreement proposing that Andrews quit employment, stated that Andrews had one day to accept it, and said that Ms. Andrews could only show it to her husband, even though they knew Ms. Andrews had an attorney representing her.

119.    Ms. Andrews decided to return to work, but did not agree to the discipline or to quit.

120.    Feldman told Ms. Andrew that she had until November 5, 2020 to turn in her request for religious exemption for the flu vaccine.

121.    Ms. Andrews turned in the request for religious exemption on or about November 4, 2020, providing the same information that she had other years, when the requested exemption was approved.

122.    On November 6, 2020,  Feldman informed Ms. Andrews that Final Warning discipline was imposed on her.

123.     Mid Coast imposed Final Warning discipline on Ms. Andrews because she was absent from work October 15 and 16, 2020 on approved FLMA medical leave for her disability.

124.     On November 6, 2020,  Feldman sent an email to Ms. Andrews stating she was required to get a flu shot to continue employment with Mid Coast, and would be suspended from employment on unpaid leave if she did not furnish proof of vaccination that day.

125.     The Hospital then suspended Ms. Andrews from employment on November 6, 2020.

126.     Ms. Andrews believes that Mid Coast approved other employees' religious exemptions from the flu vaccine, and that Mid Coast was discriminating and retaliating against her by suspending her from employment.

127.     On November 18, 2020, Ms. Andrews submitted her resignation from employment to Mid Coast because of management's ongoing hostile and discriminatory treatment.

128.     Ms. Andrews informed defendant's manager Farrell that the "undue amount of stress only aggravates  my seizure disorder to the point of having seizures on a regular basis."

129.     Ms. Andrews had no reasonable alternative but to resign from employment because Mid Coast management's hostile treatment of her was harming and endangering her health.

130.     Mid Coast's claimed grounds for hostile treatment and adverse actions against Ms. Andrews are false and pretextual.

131.     During her employment with Mid Coast, Ms. Andrews had a disability within the meaning of the ADA, in that her seizures and related health conditions substantially

16

limited her in major life activities of working, and mental functions, and in the operation of major bodily functions, including but not limited to brain and neurological functions in the absence of mitigating measures.

132.   At all material times, Ms. Andrews had a disability within the meaning of the MHRA, 5 M.R.S.A. § 4553-A.  Namely, Ms. Andrews' seizure disorder, and mental health conditions including anxiety and depression are impairments that significantly impaired her mental health or substantially limited one or more of her major life activities in the absence of mitigating measures under 5 M.R.S. § 4553-A (1)(A).

133.   At all material times, Ms. Andrews had a record of disability, in that she had a record of having a seizure disorder, and mental health conditions of anxiety and depression.

134.   Defendant regarded Ms. Andrews as a person with a disability for the purposes of the ADA and MHRA.

135.   At all relevant times, Ms. Andrews was qualified to perform the duties of her position of Patient Services Representative with defendant and was able to perform all the essential functions of her position with or without reasonable accommodations.

136.   Defendant discriminated against, subjected Ms. Andrews to a hostile work environment, and constructively discharged Ms. Andrews from employment because of her disability,  thereby discriminating against her with respect to the terms, conditions and privileges of employment because of disability, in violation of the ADA and the MHRA.

137.   Defendant suspended then constructively discharged Ms. Andrews from  employment because of disability rather than reasonably accommodating her disability, thereby discriminating against her with respect to the terms, conditions and privileges of

employment because of his disability, in violation of the ADA and the MHRA.

138.   Defendant subjected Ms. Andrews to a hostile work environment, suspended her employment and constructively discharge her because it regarded her as having a disability, thereby discriminating against her with respect to the terms, conditions and privileges of employment because of disability, in violation of the ADA and the MHRA.

139.   Defendant discriminated against Ms. Andrews  because she requested accommodation and opposed discrimination on the basis of disability, thereby retaliating and discriminating against her in violation of the ADA, the MHRA and the MWPA.

140.   Defendant discriminated and retaliated against Ms. Andrews because she requested and used medical leave protected under the FMLA and MFMLRA.

141.   Defendant's discriminatory actions toward Ms. Andrews were intentional and in violation of her rights under the ADA, FMLA, FMLRA, MHRA and MWPA.

142.   As a consequence of defendant's discriminatory actions, Ms. Andrews has suffered damages including but not limited to lost wages, emotional distress, humiliation, inconvenience, injury to reputation, injury to career and other pecuniary and non-pecuniary losses.

143.   Ms. Andrews has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and will continue to suffer irreparable injury unless defendant is enjoined by this Court.

### COUNT I: Disability Discrimination in Violation of the Americans with Disabilities Act (ADA)

144.   Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

145.     Defendant discriminated against Ms. Andrews in violation of the ADA when it discipline her and suspended her from employment because of her disability.

146.     Defendant discriminated against Ms. Andrews in violation of the ADA when it subjected her to a hostile work environment because of her disability.

147.     Defendant discriminated against Ms. Andrews in violation of the ADA when it constructively discharged her from employment because of her disability.

148.     Defendant discriminated against Ms. Andrews in violation of the ADA by unjustified discipline, suspension, subjecting her to a hostile work environment and constructive discharge because of her record of a disability.

149.     Defendant discriminated against Ms. Andrews in violation of the ADA by unjustified discipline, suspension, subjecting her to a hostile work environment and constructive discharge because it regarded her as having a disability.

150.     Defendant discriminated against Ms. Andrews in violation of the ADA when it failed to reasonably accommodate her disability, and instead suspended and constructively discharge her from employment because of disability.

151.     As a direct and proximate result of Defendant's violations of the ADA, Ms. Andrews has incurred damages.

152.     Defendant acted intentionally and with malice or reckless indifference to Ms. Andrews' rights under the ADA.

<u>**COUNT II: Retaliation in Violation of the
Americans with Disabilities Act (ADA)**</u>

153.     Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

154.    Defendant discriminated against Ms. Andrews in violation of the ADA when it retaliated against her with unjustified discipline, subjected her to a hostile work environment and constructively discharged her from employment because she requested accommodation of her disability.

155.    Defendant discriminated against Ms. Andrews in violation of the ADA when it retaliated against her with unjustified discipline, subjected her to a hostile work environment and constructively discharged her from employment because she opposed discriminatory treatment because of her disability, including by filing a charge of discrimination for disability discrimination.

156.    As a direct and proximate result of Defendant's violations of the ADA, Ms. Andrews has incurred damages.

157.    Defendant acted intentionally and with malice or reckless indifference to Ms. Andrews' rights under the ADA.

## COUNT III: Disability Discrimination in Violation of the
## Maine Human Rights Act (MHRA)

158.    Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

159.    Defendant discriminated against Ms. Andrews in violation of the MHRA when it disciplined her and suspended her from employment because of her disability.

160.    Defendant discriminated against Ms. Andrews in violation of the MHRA by subjecting her subjected her to a hostile work environment because of her disability.

161.    Defendant discriminated against Ms. Andrews in violation of the MHRA when it constructively discharged her from employment because of her disability.

162.     Defendant discriminated against Ms. Andrews in violation of the MHRA by unjustified discipline, suspension, subjecting her to a hostile work environment and constructive discharge because of her record of a disability.

163.     Defendant discriminated against Ms. Andrews in violation of the MHRA by unjustified discipline, suspension, subjecting her to a hostile work environment and constructive discharge because it regarded her as having a disability.

164.     Defendant discriminated against Ms. Andrews in violation of the MHRA when it failed to reasonably accommodate her disability, and instead suspended and constructively discharge her from employment because of disability.

165.     As a direct and proximate result of Defendant's violations of the MHRA, Ms. Andrews has incurred damages.

166.     Defendant acted intentionally and with malice or reckless indifference to Ms. Andrews' rights under the MHRA.

## **COUNT IV: Retaliation in Violation of the MHRA**

167.     Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

168.     Defendant discriminated against Ms. Andrews in violation of the MHRA when it retaliated against  her with unjustified discipline, subjected her to a hostile work environment and constructively discharged her from employment because she requested accommodation of her disability.

169.     Defendant discriminated against Ms. Andrews in violation of the MHRA when it retaliated against  her with unjustified discipline, subjected her to a hostile work environment and constructively discharged her from employment because she opposed

discriminatory treatment because of her disability, including by filing a charge of discrimination for discrimination in violation of the MHRA.

170. As a direct and proximate result of defendant's violations of the MHRA, Ms. Andrews has incurred damages.

171. Defendant acted intentionally and with malice or reckless indifference to Ms. Andrews' rights under the MHRA.

## COUNT V: Maine Whistleblowers' Protection Act, (MWPA)

172. Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

173. Ms. Andrews reported to Mid Coast that actions and practices that that she reasonably believed violated federal and Maine laws and rules prohibiting disability discrimination when she complained to Mid Coast managers in 2020 about discriminatory treatment by her supervisor.

174. Ms. Andrews reported to the Maine Human Rights Commission Mid Coast's actions and conduct that that she reasonably believed violated federal and Maine laws and rules prohibiting disability discrimination in July 2020.

175. Defendant violated the MWPA by threatening or otherwise discriminating against Ms. Andrews regarding her compensation, terms, conditions, and privileges of employment because she reported to defendant actions and practices that she reasonably believed violated federal and Maine laws and rules prohibiting disability discrimination and governing medical leave.

176. Defendant violated the MWPA when it discriminated and retaliated against Ms. Andrews

by subjecting her to a hostile work environment because she reported to defendant

practices that she reasonably believed violated federal and Maine laws and rules

prohibiting disability discrimination and governing medical leave.

177.     Defendant violated the MWPA when it discriminated and retaliated against Ms. Andrews

by suspending her from employment because she reported to defendant practices that she

reasonably believed violated federal and Maine laws and rules prohibiting disability

discrimination and governing medical leave.

178.     Defendant violated the MWPA when it discriminated and retaliated against Ms. Andrews

by constructively discharging her from employment because she reported to defendant

practices that she reasonably believed violated federal and Maine laws and rules

prohibiting disability discrimination and governing medical leave.

179.     As a direct and proximate result of defendant's violations of the MWPA,  Ms. Andrews

suffered damages.

180.     Defendant acted with malice or reckless indifference to Ms. Andrews' rights under the

MWPA.

### COUNT VI: Interference With Exercise of Rights in Violation of the Family and Medical Leave Act (FMLA)

181.     Plaintiff repeats and re-alleges each of the allegations set forth in the preceding

paragraphs as if fully set forth herein.

182.     At all times relevant to this action, Ms. Andrews was an eligible employee under the

FMLA.

183.     At all times relevant to this action, Mid Coast was an employer covered by the FMLA.

184.     Ms. Andrews qualified for FMLA benefits because of her own serious health

conditions, including her seizure disorder and mental health conditions of anxiety and depression.

185. In about February 2019, and again in 2020, Ms. Andrews through her medical care provider notified Mid Coast that Ms. Andrews would have episodic flare ups of her health conditions that would prevent her from performing her job, and for which leave was medically necessary.

186. Defendant approved Ms. Andrews' request for unscheduled intermittent leave under the FMLA including in 2019, and 2020.

187. Defendant interfered with Ms. Andrews' right to use FMLA leave by denying her request to leave a meeting due to anxiety and fear of an impending seizure on October 15, 2020.

188. Defendant interfered with and denied Ms. Andrews' right to use FMLA leave by imposing disciplinary action of Final Warning on Ms. Andrews for her use of approved unscheduled, intermittent FMLA leave on October 15 and 16, 2020 when she was experiencing anxiety and a seizure.

189. Defendant intentionally and willfully interfered with Ms. Andrews' exercise of rights under FMLA.

190. As a consequence of Defendant's interference with Ms. Andrews' rights under the FMLA, Ms. Andrews suffered damages.

## COUNT VII: Retaliation in Violation of the Family and Medical Leave Act (FMLA)

191. Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

192. Ms. Andrews engaged in protected activity under the FMLA by opposing interference

with her right to use approved unscheduled intermittent medical leave, including in October 2020.

193.     Defendant took adverse action against Ms. Andrews in retaliation for and because of her opposition to interference with use of FMLA leave by imposing discipline on her for leaving work and absences covered by FMLA leave in October and November 2020.

194.     Defendant took adverse action against Ms. Andrews in retaliation for and because of her opposition to denial of FMLA leave by constructively discharging her from employment.

195.     Defendant intentionally and willfully  retaliated against Ms. Andrews  for her opposition to denial of rights under the FMLA.

196.     As a consequence of defendant's retaliation in violation of the FMLA, Ms. Andrews suffered damages.

### COUNT VIII: Interference with Exercise of Rights in Violation of The Maine Family Medical Leave Requirement Act, ("MFMLR")

197.     Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

198.     At all times relevant to this action, Ms. Andrews was an eligible employee under the MFMLR.

199.     At all times relevant to this action, Mid Coast was an employer covered by the MFMLR.

200.     Ms. Andrews qualified for MFMLR benefits because of her own serious health conditions, including her seizure disorder and mental health conditions of anxiety and depression.

201.    In about February 2019, and again in 2020, Ms. Andrews through her medical care provider notified Mid Coast that Ms. Andrews would have episodic flare ups of her health conditions that would prevent her from performing her job, and for which leave was medically necessary.

202.    Defendant approved Ms. Andrews' request for unscheduled intermittent leave including in 2019, and 2020.

203.    Defendant interfered with Ms. Andrews' right to use MFLMLR leave by denying her request to leave a meeting due to anxiety and fear of an impending seizure on October 15, 2020.

204.     Defendant interfered with and denied Ms. Andrews' right to use MFMLR leave by imposing disciplinary action of Final Warning on Ms. Andrews for her use of approved unscheduled, intermittent medical leave on October 15 and 16, 2020 when she was experiencing anxiety and a seizure.

205.    Defendant intentionally and willfully interfered with Ms. Andrews' exercise of rights under the MFMLR.

206.    As a consequence of Defendant's interference with Ms. Andrews' rights under the MFMLR, Ms. Andrews suffered damages.

**COUNT IX: Retaliation in Violation of the MFMLR**

207.    Plaintiff repeats and re-alleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

208.    Ms. Andrews engaged in protected activity under the MFMLR by opposing interference with her right to use approved unscheduled intermittent medical leave, including in October 2020.

209.     Defendant took adverse action against Ms. Andrews in retaliation for and because of her opposition to interference with use of MFMLR leave by imposing discipline on her for leaving work and absences covered by MFMLR leave in October and November 2020.

210.     Defendant took adverse action against Ms. Andrews in retaliation for and because of her opposition to denial of MFMLR leave by constructively discharging her from employment.

211.     Defendant intentionally and willfully  retaliated against Ms. Andrews  for her opposition to denial of rights under the MFMLR.

212.     As a consequence of defendant's retaliation in violation of the MFMLR, Ms. Andrews suffered damages.

## PRAYER FOR RELIEF

Plaintiff Andrews respectfully requests that the Court grant the following relief:

A.     Enter Judgment in plaintiff's favor;

B.     Declare the conduct engaged in by defendant to be in violation of plaintiff's rights under the ADA, MHRA, MWPA, FMLA and MFMLR;

C.     Enjoin defendant MaineHealth, its agents, employees, and those acting in concert with them from continuing to violate plaintiff's rights;

D.     Order defendant to restore plaintiff Andrews to employment, or award front pay and benefits;

E.     Award equitable relief for back pay and lost benefits;

F.     Award compensatory damages under the ADA, MHRA, and MWPA in an amount to be determined at trial;

G.     Award lost wages and liquidated damages under the FMLA and MFMLR;

H.     Award nominal damages;

I.     Award attorney's fees, including legal expenses, and costs;

J.     Award prejudgment interest;

K.     Permanently enjoin defendant from engaging in any employment practices which discriminate on the basis of disability,  interfere with rights to medical leave or retaliate for opposition to illegal practices or conditions;

L.     Require  defendant to mail a letter to all employees notifying them of the verdict against them and stating that defendant will not tolerate discrimination or retaliation in the future;

M.     Require that defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

28

N.      Require that defendant train all management level employees on the protections afforded by the ADA, MHRA, MWPA, FMLA and MFMLR;

O.      Require that defendant place a document in plaintiff's personnel file which explains that defendant discriminated against plaintiff and unlawfully constructively discharged her from employment; and

P.      Grant to plaintiff such other and further relief as may be just and proper.


Respectfully Submitted,


DATE: July 12, 2022                     */s/ Lisa J. Butler*_____
                                        Lisa J. Butler, Esq.
                                        Maine Employee Rights Group, P.A.
                                        23 Water Street, Suite 207
                                        Bangor, Maine 04401
                                        lisa@employeerightslaw.attorney
                                        Telephone: (207)874-0905

                                        Attorney for the Plaintiff